UNITED STATES of America, Plaintiff,

v.

Asceneth **VILLOTA–GOMEZ** aka Asceneth Villota Gomez, and Luis Armando Perea–Vivas, aka Jorge Colon Perez, Defendants.

**Nos. 97–40084–01–SAC, 97–40084–02–SAC.**

United States District Court,
D. Kansas.

Jan. 21, 1998.

---

Marilyn M. Trubey, David J. Phillips, Office of Federal Public Defender, Topeka, KS, for Asceneth Villota–Gomez aka Asceneth Villota Gomez, defendants.

Thomas G. Luedke, Office of U.S. Atty., Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

On October 7, 1997, the grand jury returned a two count indictment charging the defendants, Asceneth Villota–Gomez and Luis Armando Perea–Vivas, with one count of possession with the intent to distribute in excess of five kilograms of cocaine (21 U.S.C. § 841) and one count of conspiracy to possess with the intent to distribute approximately five kilograms of cocaine hydrochloride (21 U.S.C. § 846).

This case comes before the court upon the following pretrial motions filed by the defendants:

**MOTIONS FILED BY VILLOTA–GOMEZ (Represented by Marilyn M. Trubey)**

1. Motion and Memorandum in support of Motion to Suppress Evidence (Dk.33).

2. Motion for a Bill of Particulars (Dk.32).

3. Motion for Disclosure of 404(b) Evidence (Dk.31).

**MOTIONS FILED BY PEREA–VIVAS (Represented by F.G. Manzanares):**

1. Motion to Suppress Evidence (Dk.29).

2. Motion for Trial Severance (Dk.23); Memorandum in Support of Motion for Trial Severance (Dk.24).

3. Motion to Compel Disclosure of Existence and Substance of Promises of Immunity, Leniency or Preferential Treatment (Dk.25); Memorandum in Support of Defendant Perea–Vivas' Motion to Compel Disclosure of Preferential Treatment (Dk.26).

4. Motion by Defendant Luis Armando Perea–Vivas For an Order Directing the Government to Disclose Whether it Intends to Offer into Evidence Proof of Other Crimes; Wrongs or Acts Under Rule 404(b) of the Federal Rules of Evidence (Dk.27).

5. Motion of (Sic) Disclosure of Plea Agreement (Dk.28).

The government has filed responses to the defendants' motions.

*See* (Dk.__ and __).

**Motion and Memorandum in support of Motion to Suppress Evidence (Dk.33).**

 Villota–Gomez contends that her Fourth Amendment rights were violated when she was unlawfully stopped by Trooper Smith of the Kansas Highway Patrol. In her brief, Villota–Gomez denies that she was speeding. However, Villota–Gomez did not testify at the hearing. Villota–Gomez proffers that she only sped up by two or three miles per hour as Trooper Smith approached from behind "in order to allow Trooper Smith's vehicle to pass her." Villota–Gomez contends that she was unlawfully detained following the unlawful stop and that her subsequent consent is invalid.[1]

The government responds, indicating that Villota–Gomez was stopped for speeding, that all of the facts known to Trooper Smith gave him a reasonable suspicion to ask additional questions following the completion of the traffic stop and that Villota–Gomez' consent to search was voluntary.

**Legal Standards**

 In general, there are three types of citizen-police encounters:

(1) consensual encounters, which involve a citizen's voluntary cooperation with an official's non-coercive questioning and which are not seizures within the meaning of the Fourth Amendment; (2) investigative detentions or "*Terry* stops," which are seizures that are justified only if articulable facts and reasonable inferences drawn from those facts support a reasonable suspicion that a person has committed or is

committing a crime; and (3) arrests, which are seizures characterized by highly intrusive or lengthy detention and which require probable cause to believe that the arrestee has committed or is committing a crime.

*United States v. Seslar,* 996 F.2d 1058, 1060 (10th Cir.1993).

 "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995). "Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Id.* (*quoting Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). For purposes of Fourth Amendment analysis, it does not matter whether: (1) "the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop," *quoting United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993), *cert. denied,* 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994); and (2) "the officer may have had other subjective motives for stopping the vehicle." *Botero–Ospina,* 71 F.3d at 787.

 The law governing the conduct of an officer during a traffic stop is well-settled in the Tenth Circuit:

An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check,

---

1. At the hearing, counsel for Perea–Vivas sought to join in Villota–Gomez' motion to suppress. As a passenger of the vehicle, Perea–Vivas has not demonstrated that he has standing to challenge the lawfulness of the search of the vehicle which resulted in the discovery of cocaine. *See United States v. McKneely,* 6 F.3d 1447, 1452 (10th Cir.1993) (mere passenger does not have standing to challenge the search of the vehicle).

However, "standing to challenge a stop presents issues separate and distinct from standing to challenge a search." *[United States v.] Erwin,* 875 F.2d [268] at 269 [(10th Cir.1989)]. Therefore, "[e]ven if [a] defendant lacks standing to challenge the search of the car, if the

initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poison tree' doctrine." *Id.* at 269 n. 2 (citations omitted).

*McKneely,* 6 F.3d at 1450.

In this case, the court concludes that the initial stop of the vehicle was not unlawful and therefore Perea–Vivas has not established a basis upon which to exclude the evidence seized during the search as fruit of the poisonous tree. Nor was there any evidence indicating that Perea–Vivas was otherwise unlawfully detained. Although permitted to join in Villota–Gomez' motion, Perea–Vivas' request for suppression of the evidence is denied.

and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

> [*quoting United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994).] *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) teaches that further questioning and the concomitant detention of a driver are permissible in either of two circumstances: (1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity (*see, e.g., United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993); *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992)) or (2) the driver voluntarily consents to the officer's additional questioning. In the first situation a Fourth Amendment seizure has taken place, but it is reasonable and consequently constitutional. In the second there is no seizure, and hence the Fourth Amendment's strictures are not implicated. But if neither of those factors is present, evidence derived from further questioning (or, a fortiori, from an ensuing search) is impermissibly tainted in Fourth Amendment terms.

*United States v. Sandoval,* 29 F.3d 537, 539–540 (10th Cir.1994); *see United States v. Lee,* 73 F.3d 1034–1039 (10th Cir.1996).

### Voluntariness of Continued Encounter

*Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991) has reconfirmed the Supreme Court's adherence:

> to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

That totality-of-the-circumstances approach means that "[n]o single factor dictates whether a seizure has occurred" (*United States v. Houston,* 21 F.3d 1035, 1037 (10th Cir.1994)). In the context of traffic stops this Circuit has adopted as an indicium of a seizure the officer's taking of necessary documentation (driver's license and vehicle registration) from a driver, and we have also considered as a necessary (but not always sufficient) condition of the termination of that seizure the officer's return of such documentation—both of those rulings being based on the premise that the requisite consent is impossible because no "reasonable person" would feel free to leave without such documentation (*United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993)).

> After the point at which the driver has his or her other documentation back, the touchstone of our analysis is simply whether—adapting the language of *Bostick* to the circumstances of a traffic stop—the driver (*United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990)):
>
> > has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way.
>
> Where such a belief is present based on the "objective" facts of the situation, a voluntary police-citizen encounter is said to arise (*see, e.g., McKneely,* 6 F.3d at 1451–53; *Werking,* 915 F.2d at 1409).

*Sandoval,* 29 F.3d at 540; *see Lee,* 73 F.3d at 1040 (The Tenth Circuit has "consistently held 'that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him.'") (*quoting United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994)). "A limited number of routine questions about travel plans and relationship to passengers, followed by a question about possession of contraband and a request to search, are not sufficient to render an otherwise consensual encounter coercive." *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996).

### Reasonable Suspicion

■ Detention "can only be justified if specific and articulable facts and rational inferences drawn from those facts gave rise to a reasonable suspicion of criminal activity." *Sandoval,* 29 F.3d at 542.

## Consensual Searches

 Under the Fourth and Fourteenth Amendments a search conducted without a warrant issued upon probable cause is *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A search authorized by consent is wholly valid and is a well-recognized exception to the prohibition against warrantless searches. 412 U.S. at 219. Voluntariness is a question of fact to be determined from the totality of all the circumstances. 412 U.S. at 227. The Government has the burden of proving the voluntariness of the consent. 412 U.S. at 222; *Soto*, 988 F.2d at 1557 ("The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue.").[2] The government "must demonstrate with clear and positive testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given." *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir.1991) (*quoting United States v. Abbott*, 546 F.2d 883, 885 (10th Cir.1977)), *cert. denied*, 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992). The Government must also prove that the consent was given without duress or coercion, express or implied. *Id.*

 The Tenth Circuit has developed a two-step inquiry to determine whether the government has sustained its burden of showing that the consent to search was voluntary.

> To admit evidence obtained from a search, wherein consent was given, the following must be found:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

*United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992) (*citing United States v. Price*, 925 F.2d 1268, 1270–71 (10th Cir.1991)). "When making this determination, the court should not presume that the consent was either voluntary or involuntary." *Soto*, 988 F.2d at 1557.

 A law enforcement officer is not required to specifically tell the driver that he is free to leave in order for an encounter to be consensual. *United States v. Anderson*, 114 F.3d 1059 (10th Cir.1997) (*citing Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (rejecting per-se rule that detention pursuant to a traffic stop cannot become consensual until officer has told detainee that he is free to leave) and *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir.1997) (noting that encounter was consensual even though officer did not tell driver she was free to go)).

## Findings

On October 7, 1997, Kansas Highway Patrolman Brian K. Smith was on routine patrol on I–35 as it passes through Osage County, Kansas. I–35 is a highway commonly used to transport narcotics from the south to the north. As Trooper Smith was traveling in a southbound direction, he observed Villota–Gomez' vehicle, a 1991 Buick Park Avenue, approaching from the opposite direction on I–35 at a speed he believed to be in excess of 70 m.p.h., the lawful speed limit.[3]

---

**2.** The government's "burden is heavier when consent is given after an illegal stop." *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994). "The government must prove that [the defendant's] consent to search is 'sufficiently an act of free will to purge the primary taint of the illegal [seizure], [or] it must be suppressed as fruit of the poisonous tree.' " *Id.* (*quoting United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir. 1989)).

**3.** At the hearing, Villota–Gomez' counsel suggested that Trooper Smith's testimony regarding his ability to judge speed based upon his personal observations was not credible as it is difficult for anyone to accurately assess the speed of an ap-

proaching vehicle. Contrary to the defendant's suggestion, the court believes that it is possible for Trooper Smith, a member of the Kansas Highway Patrol for over nine years, to make reasonably accurate estimates of speed based upon his personal observations and extensive experience.

In *Greenway v. Commonwealth*, 487 S.E.2d 224 (Va.1997), the Supreme Court of Virginia made these comments about estimates of speed:

> "An estimate of the speed at which an automobile was moving at a given time is generally viewed as a matter of common observation rather than expert opinion, and it is accordingly well settled that any person of ordinary

Trooper Smith's radar detector indicated that the vehicle was traveling at 79 m.p.h., or nine miles per hour over the posted speed limit. Trooper Smith then turned across the median separating the north and southbound lanes and proceeded to overtake the Buick. Trooper Smith activated the lights on his vehicle and the Buick pulled to the side of the road.

At the time that the lights were activated, the video-recorder in Trooper Smith's car automatically began recording.[4] Trooper Smith asked the driver of the vehicle for her driver's license, registration and proof of insurance. As Trooper Smith stood next to the car, he noticed the strong odor of "bondo," a substance used as body putty, and fresh paint coming from the interior of the car. However, Trooper Smith saw no signs of recent repair. From his knowledge and experience, Trooper Smith knew that drug traffickers often used bondo or similar substances to close hidden compartments used for transporting narcotics.

The Texas drivers license indicated that the driver's name was Asceneth Villota-Gomez. The passenger carried a Texas identification card bearing the name Jorge Colon Perez. After handing his identification to Trooper Smith, the passenger simple stared forward and avoided eye contact with Trooper Smith. After receiving the occupants' identification and the other paperwork regarding the automobile, Trooper Smith noticed that neither the driver nor the passenger was the owner of the automobile. The occupants seemed unusually nervous. At Trooper Smith's request, Villota-Gomez followed him back to his patrol car. As Trooper Smith was completing his computer checks and preparing the warning citation he struck up a conversation with Villota-Gomez, asking her about the owner of the car and where she was going. Villota-Gomez indicated that she had borrowed the car from a person she knew as "Yolanda," but did not know her last name. Villota-Gomez also indicated that she was going to her cousin Amanda's wedding in Kansas City. However, Villota-Gomez did not know where the wedding was going to be held and apparently did not know her cousin's exact address. Instead, Villota-Gomez was to meet someone in Kansas City on "Indiana" at a convenience store.

After completing the computer checks and filling out the citation, Trooper Smith returned the paperwork to Villota-Gomez. Trooper Smith only issued a warning citation to Villota-Gomez for speeding. Based upon his mounting suspicion, Trooper Smith asked for consent to search the vehicle. Villota-Gomez consented and opened the trunk. During his search of the vehicle, Trooper Smith found over five kilograms of cocaine behind the rear seat in a hidden compartment. Both Villota-Gomez and Perea-Vivas were placed under arrest.

### Analysis

 Based upon the facts presented at the December 17, 1997, hearing, the court denies Villota-Gomez' motion to suppress. Villota-Gomez was lawfully stopped for speeding. Trooper Smith's questions while waiting for the computer checks to be completed did not lengthen the time necessary to issue the warning citation. Upon the return of her identification and other paperwork, Villota-Gomez should have reasonably understood that she was free to leave, albeit that Trooper Smith did not tell her so expressly. In short, this case bears none of the indicia that might have given rise a reasonable belief that Villota-Gomez and her passenger were

---

experience, ability, and intelligence having the means or opportunity of observation, whether an expert or nonexpert, and without proof of further qualification may express an opinion as to how fast an automobile which came under his observation was going at a particular time. The fact that the witness had not owned or operated an automobile does not preclude him from so testifying. Speed of an automobile is not a matter of exclusive knowledge or skill, but anyone with a knowledge of time and distance is a competent witness to give an esti-

mate; the opportunity and extent of observation goes to the weight of the testimony."
*Id.* at 227(*quoting Moore v. Lewis,* 201 Va. 522, 525, 111 S.E.2d 788, 790 (1960) (citations omitted)).

4. During the consensual search of the vehicle, the videotape ends. Trooper Smith explained that the tape simply ran out. The court accepts that explanation and ascribes no significance to that fact in its review of the tape and other evidence relevant to this case.

not free to leave. *See McKneely,* 6 F.3d at 1451 *(citing United States v. McKneely,* 810 F.Supp. 1537, 1544 (D.Utah 1993)).

After it is was clear that she was free to leave, Villota–Gomez voluntarily consented to the search of the vehicle.[5] Nothing in the manner in which Trooper Smith asked for permission to search the vehicle was coercive. The government has presented clear and positive testimony that Villota–Gomez' consent was unequivocal and specific and freely given and that her consent was not the product of duress or coercion, express or implied. Villota–Gomez' motion to suppress is denied.

5. Although unnecessary to its decision, the court simply notes that even if the encounter between Villota–Gomez and Trooper Smith at the time she consented to the search was not voluntary, Trooper Smith had reasonable suspicion to briefly detain Villota–Gomez and ask her additional questions in light of all the information gleaned during the traffic stop. Villota–Gomez indicated that she was from Cali, Colombia, a well known source of cocaine. Villota–Gomez' uncertain travel plans were suspicious. As the government suggests, one of the hallmarks of a drug courier is the inability to accurately describe his or her travel itinerary. Those facts, combined with the nervousness of the occupants of the vehicle, the smell of "bondo," and the fact that Villota–Gomez did not know the last name of the owner of the car she had just driven from Texas, justified a few more questions.

The court expresses no opinion on the government's suggestion that these facts provided probable cause to search the vehicle.

6. In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." "[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.' " *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994) *(quoting United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993)).

For purposes of *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). "The latter portion of this defini-

**Motion to Suppress Evidence (Dk.29).**

Perea–Vivas seeks an order suppressing his post-arrest statements to Senior Special Agent Sal Molina of the Immigration and Naturalization Service. In his motion, Perea–Vivas argues that at the time he made statements to SA Molina, he had invoked his *Miranda* rights.[6] Consequently, the defendant seeks suppression of his statements based upon a *Miranda* violation. Because the defendant's motion is not accompanied by a memorandum or any discussion of the facts, he does not identify with any specificity the statements he seeks to suppress. The government responds, indicating that the only statements made by Perea–Vivas were elicited during routine booking procedures.

tion focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* "A person is 'in custody' for the purposes of *Miranda* if he has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, "or his freedom of action has been curtailed to a 'degree associated with a formal arrest,' *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)(per curiam)." *Ritchie,* 35 F.3d at 1477. "A person has been taken into police custody whenever he 'has been deprived of his freedom of action in any significant way.' " *Perdue,* 8 F.3d at 1463 *(quoting Miranda,* 384 U.S. at 444 (1966)). "The only relevant inquiry is 'how a reasonable man in the suspect's position would have understood his situation.' " *United States v. Robertson,* 19 F.3d 1318, 1321 (10th Cir.) *(quoting Perdue,* 8 F.3d at 1463) *(quoting Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994).

In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U.S., at 484–485, 101 S.Ct., at 1884–1885—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). *McNeil v. Wisconsin,* 501 U.S. 171, 176–77, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "The *Edwards* rule, moreover, is not offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." *Id.* 501 U.S. at 177 *(citing Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)).

Those statements apparently recant Perea–Vivas' previous false statements regarding his identity and place of origin. The government contends that Senior Special Agent Sal Molina was merely attempting to obtain accurate biographical information to properly identify the defendant and was not attempting to elicit incriminating information from him.

### Miranda and Booking Procedures

In *United States v. Parra*, 2 F.3d 1058 (10th Cir.),[7] *cert. denied*, 510 U.S. 1026, 114 S.Ct. 639, 126 L.Ed.2d 597 (1993), the Tenth Circuit considered an issue similar to the one apparently at bar:

> Mr. Sotelo contends that the district court erred in denying his motion to suppress statements regarding his identity that he made during questioning by Agent Robert Godshall of the Immigration and Naturalization Service ("INS"). The district court held, and the government now argues, that the questioning fell within the "routine booking questions" exception to Miranda. We disagree with the district court, but conclude that its error was harmless.

> Agent Godshall first questioned Sotelo shortly after his arrest at the motel room on May 14, 1991. At that time, Sotelo gave his name as Ricardo Duarte Antion. He also confessed to having entered the country illegally. After Sotelo was taken into state custody at the Bernalillo County Detention Center ("BCDC"), the INS placed a detainer on him so that when he was released, he would be released into federal custody. While Sotelo was in state custody, Agent Godshall attempted to research the immigration history of Ricardo Duarte Antion. Unable to find any reference to a person of that name, Agent Godshall conducted further research and determined that Sotelo was Jose Sotelo Duarate and that he had been deported from the United States.

> Upon being informed by officials at the BCDC on May 17, 1991 that Sotelo was about to post bond, Agent Godshall proceeded to the BCDC to take Sotelo into federal custody. At the BCDC, Agent

> Godshall encountered Sotelo in the booking area where Sotelo was attempting to recover his belongings in preparation for his release. Hoping to get Sotelo to admit his real name, Agent Godshall asked Sotelo, "How is it going, Jose?" After Sotelo responded affirmatively to that name, Agent Godshall said, "So that's your name, Jose. It's not Ricardo Duarte?" Sotelo admitted that Duarte was not his name. Agent Godshall testified that he engaged Sotelo in this conversation to get him to admit his true name. He further testified that information related to Sotelo's identity would help him determine whether Sotelo was in the country illegally.

> Sotelo contends that this questioning at the BCDC was in violation of his Miranda rights. We agree. It is well established that a suspect may not be subjected to custodial interrogation in the absence of an attorney once that suspect has chosen to exercise her *Miranda* rights. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *United States v. Giles*, 967 F.2d 382, 385 (10th Cir.1992). Unless the suspect knowingly and intentionally waives those rights, the police must refrain from questioning the suspect outside the presence of her lawyer. *Edwards*, 451 U.S. at 482, 484–85, 101 S.Ct. at 1884–85; *Giles*, 967 F.2d at 385.

> The government concedes that Agent Godshall subjected Sotelo to custodial questioning, but contends that the encounter falls within the exception for "routine booking questions." In *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), a plurality of the Court recognized the exception "which exempts from *Miranda's* coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'" *Id.* at 601–02, 110 S.Ct. at 2650–51 (*quoting United States v. Horton*, 873 F.2d 180, 181 n. 2 (8th Cir.1989)) (plurality of four justices). The government argues that the questions regarding Sotelo's name fall

7. Although *Parra* is the most applicable precedent from the Tenth Circuit to discuss the issues

presented by Perea–Vivas' motion, neither party cites this case.

squarely within this exception. We disagree.

The underlying rationale for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses. *See United States· v. Clark,* 982 F.2d 965, 968 (6th Cir.1993); *United States v. Monzon,* 869 F.2d 338, 342 (7th Cir.), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). As the *Muniz* plurality itself recognized, "the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 (internal quotations omitted). Thus, where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of *Miranda. See United States v. Henley,* 984 F.2d 1040, 1042 (9th Cir.1993). In this case, Agent · Godshall did not question Sotelo to obtain general booking information. Rather, he questioned Sotelo about his true name for the direct and admitted purpose of linking Sotelo to his incriminating immigration file. Under these circumstances, the questioning was reasonably likely to elicit incriminating information relevant to establishing an essential element necessary for a conviction of being an illegal alien in possession of a firearm. *See United States v. Equihua–Juarez,* 851 F.2d 1222, 1227 (9th Cir.1988). We therefore conclude that the district court erred when it found that Agent Godshall did not interrogate Sotelo. Because the government concedes that Sotelo was in custody and had not waived his Miranda rights, we further conclude that the court erred in denying the motion to suppress Sotelo's oral statements regarding his identity.

*Id.* at 1067–68. The Tenth Circuit found, however, that the error was harmless beyond a reasonable doubt as the defendant's "identity was never issue during trial" and that there was overwhelming evidence that the defendant used an alias. *Id.* at 1068. *See United States v. Minkowitz,* 889 F.Supp. 624, 626–28 (E.D.N.Y.1995) (thoroughly discuss-

ing factors to consider in determining whether statements fall within the limited "booking" exception).[8]

### Findings

At the time of his arrest, Perea–Vivas carried a Texas identification card identifying himself as Jorge Colon–Perez.. Because it was apparent that Perea–Vivas barely understood the English language, Senior Special Agent Molina, an agent of the Immigration and Naturalization Service, was contacted by law enforcement officers to interview Perea–Vivas. SA Molina is fluent in both Spanish and English. SA Molina arrived during the time Perea–Vivas was being booked. Perea–Vivas identified himself as Jorge Colon–Perez, the same name found on the Texas identification card. In response to SA Molina's question, Perea–Vivas stated that ˙he was from Puerto Rico. Based upon his knowledge of accents, SA Molina was confident that Perea–Vivas' accent was more consistent with the accent a person from Columbia, rather than Puerto Rico. To confirm his suspicion, SA Molina asked Perea–Vivas questions like "What do you call an orange in Puerto Rico?" Perea–Vivas' responses to that question and other similar questions further indicated to SA Molina that Perea–Vivas was not a denizen of Puerto Rico as he claimed. At the time, although he had no information other than Perea–Vivas' own statements regarding his identity and place of origin, SA Molina believed it likely that Perea–Vivas was an illegal alien. In his work with INS, it is obvious that SA Molina is charged with investigating the presence of illegal aliens within the United States.

SA Molina advised Perea–Vivas of his *Miranda* rights in Spanish. Perea–Vivas refused to waive those rights and declined to talk further with law enforcement officers. Despite the fact that Perea–Vivas had invoked his *Miranda* rights, SA Molina made one additional attempt to extract Perea–Vivas' true identification. SA Molina approached Perea–Vivas one more time and stated ˙something to the effect that "Hey, if you get sick or die while you are in jail, we

---

**8.** Prior to the December 17, 1997, ·hearing, the court provided counsel for the government and the defendant with a copy of *Parra* and *Minkowitz.*

won't have any way to contact your family or anyone. Why not ·tell us the truth about your identity?" Apparently succumbing to the pressure exerted by that question and its predicate, Perea–Vivas revealed his .true identity and citizenry to SA Molina.

## Analysis

■ During the entire time that SA Molina questioned Perea–Vivas, Perea–Vivas was obviously in custody within the meaning of *Miranda.* It is also clear that prior to the conclusion of the interview by SA Molina, Perea–Vivas was advised of his *Miranda* rights and that he invoked them prior to admitting his true identity. The only issue is whether SA Molina's custodial questions were part of the routine booking procedure or were they beyond the scope of mere "booking procedures," and instead were questions intended to illicit incriminating statements. Stated another way, were the final questions asked by SA Molina simply part of a predominately clerical procedure intended primarily for bookkeeping, or were they primarily intended for the improper investigative purpose of eliciting incriminating statements from a person who has invoked his *Miranda* rights?

The court believes that the Tenth Circuit's decision in *Parra* essentially compels it to grant the defendant's motion to suppress his statements about his identity made to SA Molina following his invocation of his *Miranda* rights. The government's attempt to characterize SA Molina's questions as those concomitant with routine booking ignores the factual similarity of *Parra.* It is clear that SA Molina's questions to Perea–Vivas following his invocation of his right to remain silent were intended to elicit incriminating admissions regarding Perea–Vivas' "false" identity. In fact, SA Molina essentially admitted that he was attempting to elicit incriminating admissions from Perea–Vivas' about his false identity, while the agent in *Parra* basically used a "trick" (How is it going, Jose [the defendant's real name]?) as the initial form of "interrogation" in *Parra.*

■ Although proving a false identity is not an element of either drug trafficking crime with which Perea–Vivas is charged in this case, it is beyond peradventure that a defendant's use of false identification is evidence relevant to show evidence of consciousness of guilt. *See United States v. Gomez,* 810 F.2d 947, 955 (10th Cir.), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987); *United States v. Wilson,* 11 F.3d 346, 353 (2nd Cir.1993) ("Moreover, the use of false identification is relevant and admissible to show consciousness of guilt, *see United States v. Morales,* 577 F.2d 769, 772 (2d Cir.1978) . . ."), *cert. denied,* 511 U.S. 1130, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994); *Minkowitz,* 889 F.Supp. at 628 ("Indeed, the Second Circuit has repeatedly held (at the government's urging) that a defendant's use of false identification is relevant to show consciousness of guilt.") (citing *Wilson* ). That Perea–Vivas gave a false identity to law enforcement officers would clearly undercut any assertion that he was merely an unwitting passenger in the vehicle transporting cocaine. Although SA Molina's questioning was clearly designed to elicit incriminating information regarding Perea–Vivas' alien status, and thereby prove an element of one of the crimes SA Molina suspected Perea–Vivas to have committed, it was also designed to elicit the admission that Perea–Vivas had provided a false identity to law enforcement officers. From the defendant's standpoint, these questions were clearly designed to elicit incriminating information. The fact that the· information obtained by that question was actually used in booking the defendant under his true name does not convince the court under the circumstances of this case that this mode of inquiry was part of a routine booking procedure.

The government attempts to distinguish *Parra* in that the agent in *Parra* was virtually certain that the defendant had given a false identity, whereas SA Molina merely deemed it very likely that Perea–Vivas had given law enforcement officers false identification. The court believes that this is a distinction without a difference in this case, as SA Molina, based upon the information and personal knowledge that he possessed, knew or should have known that his questions were likely to elicit an incriminating response from Perea–Vivas. If this were not so, the court seriously doubts that SA Molina would have pressed the matter of definitely resolving any questions about the defendant's

identity following his invocation of his *Miranda* rights. In short, the differences in timing and circumstances in *Parra* seem inconsequential. SA Molina's questioning crossed beyond the bounds of "routine" or "basic" booking procedures. SA Molina's statement and questions were a guise for obtaining incriminating information rather than a perfunctory clerical procedure.

In sum, the court concludes Perea–Vivas' statements regarding his true identity were the product of custodial interrogation that cannot be fairly characterized as simply part of routine booking procedures. Perea–Vivas' statements in response to SA Molina's statement and question, "Hey, if you get sick or die while you are in jail, we won't have any way to contact your family or anyone. Why not tell us the truth about your identity?" are suppressed.

**Motion for a Bill of Particulars (Dk.32).**

Villota–Gomez seeks an order requiring the government to file a bill of particulars. She contends that a bill of particulars is necessary to avoid unfair surprise, to plead double jeopardy in subsequent cases, to identify coconspirators, aiders and abettors, and to determine the quantity of drugs she is alleged to have conspired to distribute. The government opposes the defendant's motion, arguing that a bill of particulars is unwarranted under the applicable legal standards. The government suggests that based upon his conclusory arguments, the defendant is merely seeking additional discovery in the form of a bill of particulars.

### Bill of Particulars

"An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.'" *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir.1991) (*quoting United States v. Staggs*, 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 719, 107

L.Ed.2d 739 (1990)). In the Tenth Circuit, it is usually enough for the indictment to track the statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir.1988). An indictment is held only to minimal constitutional standards. *United States v. Edmonson*, 962 F.2d 1535, 1541 (10th Cir.1992). The sufficiency of an indictment is judged "by practical rather than technical considerations." *Id.* The district court has broad discretion in deciding a motion for bill of particulars. *Id.*

" 'The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.' " *Dunn*, 841 F.2d at 1029 (*quoting United States v. Cole*, 755 F.2d 748, 760 (11th Cir.1985)). *See United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir.1996) ("The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense.") (*quoting United States v. Levine*, 983 F.2d 165, 166–67 (10th Cir.1992)) (citations and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996); *United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir.1995).

Though it may provide more information, a bill of particulars is not intended to serve as a discovery device or to compel the government's disclosure of the factual proof planned for trial. *Dunn*, 841 F.2d at 1029.[9] Nor is it a way to require the government's explanation of the legal theories expected at trial. *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir.1983).

### Analysis

Based upon these standards, the defendant's request for a bill of particulars is denied. The defendant has clearly made an

9. In light of this holding, the court does not believe that the government's failure to identify all possible coconspirators, aiders and abettors in the indictment is per se prejudicial to the defendant as she suggests. *See United States v. Hughes*, 817 F.2d 268, 272 (5th Cir.1987) (rejecting per se prejudice rule announced in *United States v. Rogers*, 617 F.Supp. 1024 (D.C.Colo. 1985)), *cert. denied*, 484 U.S. 858, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987).

inadequate showing that a bill of particulars is warranted in this case. The indictment adequately apprises the defendant of the crimes charged. A comparison of the allegations in both counts with those found in the case law establishes the sufficiency of the indictment. As the government suggests, the defendant appears to be fishing for information regarding another, ongoing criminal investigation.

■ Moreover, the government has provided both defendants with "full discovery" which should enable the defendants to understand the government's case. "A bill of particulars is not required when information necessary for a defendant's defense can be obtained through 'some other satisfactory form'" *United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991) (citations omitted), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). "The nature and operations of the 'open file' policy is an adequate 'satisfactory form' of information retrieval, making the bill of particulars unnecessary." *Id.* (citations omitted); *see Kunzman*, 54 F.3d at 1526; *United States v. Sturmoski*, 971 F.2d 452, 460 (10th Cir.1992) (given the government's full disclosure and the defendant's failure to show that he was actually surprised at trial and thereby incurred prejudice to his substantial rights, the district court did not abuse its discretion in denying the defendant's motion for a bill of particulars). In light of the discovery provided by the government, a bill of particulars is not warranted.

Under these circumstances, the defendant's request for a bill of particulars is denied.

**Motion for Disclosure of 404(b) Evidence (Dk.31); Motion by Defendant Luis Armando Perea–Vivas For an Order Directing the Government to Disclose Whether it Intends to Offer into Evidence Proof of Other Crimes, Wrongs or Acts Under Rule 404(b) of the Federal Rules of Evidence (Dk.27).**

Both defendants seek an order compelling the government to disclose information it intend to offer under Fed.R.Evid. 404(b). The government responds, indicating that at this time it does not intend to offer 404(b)

evidence. "If such information becomes available, the government will notify the Court and defendant's counsel immediately."

In light of the government's response, the defendant's motions are denied as moot.

**Motion for Trial Severance (Dk.23).**

Perea–Vivas seeks a severance under Fed. R.Crim.P. 14. In support of his motion, Perea–Vivas claims that his defendant has made out of court statements which, if introduced, will violate his right of confrontation as established in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Perea–Vivas also argues that the jury will not be able to compartmentalize the evidence against each defendant, and the danger of "spillover" will preclude him from receiving a fair trial. None of these claims are described with any factual precision.

The government opposes the defendant's motion. In support of this position, the government invokes the general rule in the Tenth Circuit that persons jointly indicted should be jointly tried. In short, the government argues that nothing the defendant argues is sufficient to carry his heavy burden of demonstrating that severance is appropriate. Because the defendant has not presented anything to substantiate his general claim of prejudice, the government asks the court to deny the defendant's request.

### Analysis

■ Fed.R.Crim.P. 8 provides that "two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transactions constituting an offense or offenses." In the Tenth Circuit, defendants charged jointly under Rule 8 are not entitled to separate trials as a matter of right. To determine whether joinder is appropriate under Rule 8, the court must consider the facts and circumstances of each case. *See United States v. Bailey*, 952 F.2d 363, 364–65 (10th Cir.1991).[10]

■ Under proper circumstances, the court may grant severance even if joinder under Rule 8 is appropriate. *United States v. Hollis*, 971 F.2d 1441, 1456 (10th Cir.1992),

---

**10.** The defendant in this case does not argue that he is not properly joined under Rule 8.

*cert. denied,* 507 U.S. 985, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). Fed.R.Crim.P. 14 provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance or provide whatever other relief justice requires...

"In determining the merits of a motion for severance, the court must weigh the prejudice to a particular defendant caused by the joinder against the important considerations of economy and expedition in judicial interests." *United States v. Mabry,* 809 F.2d 671, 681 (10th Cir.), *cert. denied,* 484 U.S. 874, 108 S.Ct. 33, 98 L.Ed.2d 164 (1987), and *overruled on other grounds, Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). Severance is a matter of discretion, not of right, and the defendant bears a heavy burden of demonstrating prejudice to his case. *Hollis,* 971 F.2d at 1456. "The Supreme Court has emphasized that trial courts have 'a continuing duty at all stages of the trial to grant a severance if prejudice does appear.'" *United States v. Peveto,* 881 F.2d 844, 857 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989) (quoting *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960)).

▮▮▮▮ The fact that evidence against one defendant is more incriminating than another is not, standing alone, a basis for severance. *United States v. Dill,* 693 F.2d 1012 (10th Cir.1982); *see also United States v. Cox,* 934 F.2d 1114, 1120 (10th Cir.1991) (that the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14). Severance is not required because a defendant might have a better chance of acquittal if the trials had been severed. *Peveto,* 881 F.2d at 857; *United States v. Petersen,* 611 F.2d 1313 (10th Cir.), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2986, 64 L.Ed.2d 854 (1979). Similarly, a complaint that the "spillover effect" from the evidence that was overwhelming or more damaging against the co-defendant than the evidence against the moving party is insufficient to warrant severance. *United States v. Hack,* 782 F.2d 862, 870 (10th Cir.),

*cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *United States v. Cox,* 934 F.2d 1114, 1119 (10th Cir.1991).

▮▮▮. Moreover, the court may instruct the jury that it should consider individually the charges against each defendant and the evidence presented, and not consider any evidence admitted solely against one defendant against another defendant. *See United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir.1992) (severance not required if some evidence is admissible against some defendants and not others); *see also United States v. Cardall,* 885 F.2d 656 (10th Cir.1989) (the assumption that juries can and will follow the instructions they are given is fundamental to our system).

Besides being a "preference in the federal system," joint trials "'play a vital role in the criminal justice system.'" *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317, 324 (1993) (quoting *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). Joint trials promote economy and efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent trials." *Richardson,* 481 U.S. at 209. Such interests are obviously served in having a joint trial of defendants who are indicted together and are alleged to have participated mutually in the charged offense. *See U.S. v. Jenkins,* 904 F.2d 549, 557 (10th Cir.), *cert. denied,* 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990). Consequently, "[c]ourts generally adhere to the principle that 'those indicted together, especially co-conspirators, should be tried together.'" *Peveto,* 881 F.2d at 857 n. 16 (quoting 8 J. Moore, W. Taggert & J. Wicker, *Moore's Federal Practice* ¶ 14.05, pp. 14–82 (2 ed.1989)); *see Jenkins,* 904 F.2d at 556–557 (persons jointly indicted should be tried together); *United States v. Brantley,* 986 F.2d 379, 383 (10th Cir.1993) (defendants indicted together should be tried together).

▮▮▮ The Supreme Court recently discussed the issue of severance under Rule 14 in *Zafiro:*

> We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance un-

der Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. *See Kotteakos v. United States,* 328 U.S. 750, 774–775, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. *See, e.g., Tifford v. Wainwright,* 588 F.2d 954 (5th Cir.1979) (per curiam). The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in *Richardson v. Marsh,* [481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)] less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice. *See* 481 U.S. at 211.

*Zafiro,* 113 S.Ct. at 938, 122 L.Ed.2d at 325. Rule 14 does not compel severance even when the risk of prejudice is shown, for the trial court still retains the discretion to create a remedy which will abate the risk of prejudice. *Id.*

■ The mere fact that one defendant seeks to cast blame on the other does not create prejudice. In *United States v. Linn,* 31 F.3d 987 (10th Cir.1994), the Tenth Circuit rejected a claim of "mutually antagonistic" defenses as a ground for a severance:

Here, the mutual antagonism complained of by defendants amounts to no more than finger pointing. The Sturlins maintained that they had nothing to do with the fire at all and that Mr. Linn and others committed the arson as part of a scheme to coerce Guy Sturlin to invest money. Likewise, Mr. Linn contended that he had nothing to do with the fire and that the Sturlins and Mr. Kerns committed the arson. Of course, Defendants also posited that each had nothing to do with the fire and that it was either accidental or due to an unknown arsonist. These defenses simply are not so contradictory that the jury must have necessarily disbelieved one to believe another. The jury could have believed all of Defendants' theories and acquitted all of them, but, unfortunately for Defendants, did not.

31 F.3d at 992.

■ The defendants assert without elaboration that a *Bruton* problem [11] exists. " '[F]or *Bruton* to apply, a codefendant's statement must be clearly inculpatory standing alone.' " *United States v. Arias,* 984 F.2d 1139, 1142 (11th Cir.) *(quoting United States v. Satterfield,* 743 F.2d 827, 849 (11th Cir.), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985)), *cert. denied,* 508 U.S. 979, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993); *see United States v. Glass,* 128 F.3d 1398, 1402–04 (10th Cir.1997) (distinguishing *Arias* ); *United States v. Hill,* 901 F.2d 880, 884 (10th Cir.1990) (*Bruton* applies only to " 'clearly inculpatory' comments that are 'vitally important to the government's case.' " *(quoting United States v. Espinosa,* 771 F.2d 1382, 1399 (10th Cir.), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985))). Thus, there is not a *Bruton* problem when "the statement 'was not incriminating on its

11. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his codefendant's confession, which incriminates both defendants, is introduced at their joint trial, even if the jury is instructed to consider that confession only against the non-testifying codefendant.

face, and became so only when linked with evidence introduced later at trial'" *United States v. Brazel,* 102 F.3d 1120, 1140 (11th Cir.) (*quoting Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)), *cert. denied,* —— U.S. ——, 118 S.Ct. 78, 139 L.Ed.2d 37 (1997).

"*Bruton,* . . ., does not hold that defendants in joint trials involving *Bruton* problems are entitled to separate trial." *United States v. Hill,* 901 F.2d 880, 883 (10th Cir. 1990). *Bruton* problems are avoided, however, by severance, but severance is not required. *Id., see United States v. Ridley,* 814 F.Supp. 992, 1000–1001 (D.Kan.1993) (severance not compelled when confronted with a potential *Bruton* problem). "Severance is required 'only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant.'" *U.S. v. Comeaux,* 955 F.2d 586, 590 (8th Cir.) (*quoting U.S. v. Long,* 900 F.2d 1270, 1279 (8th Cir.1990)), *cert. denied,* 506 U.S. 845, 113 S.Ct. 135, 121 L.Ed.2d 89 (1992).

 *Bruton* problems may be avoided by redaction of the codefendant's statements coupled with the use of limiting instructions. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Ridley,* 814 F.Supp. at 1000. Moreover, as the defendant has not identified which statements the other codefendant has made that, if introduced into evidence, are potentially violative of his own confrontation clause rights, it is impossible for the court to evaluate the merits of this claim. The court also notes that coconspirator statements made in furtherance of a conspiracy that satisfy the requirements of Fed.R.Evid. 801(d)(2)(E) also satisfy the Confrontation Clause. *See United States v. Garcia,* 994 F.2d 1499 (10th Cir.1993); *United States v. Mayes,* 917 F.2d 457, 464 (10th Cir.1990), *cert. denied,* 498 U.S. 1125, 111 S.Ct. 1087, 112 L.Ed.2d 1192 (1991).

 In this case, the defendant has not demonstrated that severance is appropriate. Nothing presented to the court demonstrates that either defendant will be prejudiced in a manner that cannot be addressed by appropriate instructions to the jury. The defendant's motion for severance is denied.

**Motion to Compel Disclosure of Existence and Substance of Promises of Immunity, Leniency or Preferential Treatment (Dk.25); Memorandum in Support of Defendant Perea–Vivas' Motion to Compel Disclosure of Preferential Treatment (Dk.26); *and* Motion or (Sic) Disclosure of Plea Agreement (Dk.28).**

The defendant seeks disclosure of any offers of immunity, leniency or preferential treatment. The defendant also seeks disclosure of any plea agreements made with any other persons. The government responds, indicating that it has not made any such offers at this time. In regard to the defendant's requests about plea agreements with other persons, the government indicates that "defendant's counsel will be notified if any such agreements are made.".

In light of this response, the defendant's motion is denied as moot. The government is reminded of its constitutional and statutory obligations of disclosure.

IT IS THEREFORE ORDERED that Villota–Gomez' "Motion and Memorandum in support of Motion to Suppress Evidence" (Dk.33) is denied.

IT IS FURTHER ORDERED that Villota–Gomez' "Motion for a Bill of Particulars" (Dk.32) is denied.

IT IS FURTHER ORDERED that Villota–Gomez' "Motion for Disclosure of 404(b) Evidence" (Dk.31) is denied as moot.

IT IS FURTHER ORDERED that Perea–Vivas' "Motion to Suppress Evidence" (Dk.29) is granted as set forth in the body of this opinion.

IT IS FURTHER ORDERED that Perea–Vivas' "Motion for Trial Severance" (Dk.23) is denied.

IT IS FURTHER ORDERED that Perea–Vivas' "Motion to Compel Disclosure of Existence and Substance of Promises of Immunity, Leniency or Preferential Treatment" (Dk.25) is denied as moot.