**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph William HILL, Jr.,**
**Defendant–Appellant.**

**No. 89–3076.**

United States Court of Appeals,
Tenth Circuit.

April 24, 1990.

Kevin E.J. Regan of Yonke, Arnold and Newbold, P.C., Kansas City, Mo., for defendant-appellant Joseph William Hill, Jr.

Leon J. Patton (Benjamin L. Burgess, Jr., U.S. Atty., with him on the briefs), Asst. U.S. Atty., Kansas City, Kan., for plaintiff-appellee.

Before TACHA and EBEL, Circuit Judges, and SEAY, District Judge.*

* Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

TACHA, Circuit Judge.

Defendant Joseph Hill, Jr., appeals his conviction for: possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1); conspiracy with intent to distribute cocaine, 21 U.S.C. § 846; and attempt to possess with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). Hill argues on appeal that the district court erred by admitting the incriminating hearsay statements of his nontestifying codefendant and by failing to grant a mistrial following the introduction of testimony implicating the defendant in an uncharged crime. We reverse and remand for a new trial.

## I.

On October 14, 1988, the Los Angeles, California Postal Inspection Sevice noted that an Express Mail package fit the characteristics of the Service's drug package profile. The package was addressed to Hill's codefendant, Laurena Lux, at her Kansas City, Missouri workplace. The postal authorities removed the package from the mail stream so that a Los Angeles police officer and his trained drug detection dog could examine the package. The dog alerted to the parcel. The authorities then forwarded the package to the Kansas City, Missouri Airport Mail Facility, where it arrived on Saturday, October 15.

On Monday, October 17, the postal authorities in Kansas City took the package to the Lenexa, Kansas police department, where another drug detection dog alerted to the package. The postal authorities then obtained a search warrant and opened the package. Inside, they found approximately two kilograms of cocaine formed in two separate bricks and packed inside a laundry detergent box. Pursuant to a federal court order, the postal authorities placed a tracking and signalling device inside the package. After replacing all but approximately 6.35 grams of the cocaine with a substitute substance Postal Inspec-

tor Laura Stewart, dressed as a letter carrier, delivered the package to Lux at her workplace on October 18. The authorities secretly videotaped Lux as she signed for the package and then walked around the corner of the building to observe the mail truck as it drove away.

Approximately thirty minutes later, Lux, accompanied by her employer, left her workplace with the drug package and drove to the Kansas City, Kansas residence of Defendant Hill. After dropping the package off and driving away, Lux and her employer were arrested. The police subsequently dropped all charges against Lux's employer after determining that she had no knowledge that there were any drugs in the package delivered to Hill.

Shortly after Lux left Hill's house, the signalling device indicated that someone had opened the drug package. Shortly thereafter, Hill drove away from his home and the police arrested him.

The police and federal authorities maintained their surveillance of the Hill residence and executed a search warrant later in the day. They found no one else in the home. The drug package had been opened and placed in a trash can on the front porch. In addition to the Vogue detergent box which contained the cocaine, the officers found another Vogue detergent box under the sink. Vogue detergent is sold only in southern California. The search also revealed two sets of weighing scales of the type commonly used for weighing drugs.

A search of Hill's car, pursuant to another warrant, revealed a sheet which, according to the testimony of a drug enforcement agent, contained records of drug sales. The police also found 14.2 grams of cocaine in the trunk of Hill's car.

Following their arrest, the police and federal authorities interrogated Lux and Hill. Postal Inspector Stewart and Kansas City, Missouri Police Detective Sam Burroughs interviewed Lux, who told them that Hill had asked her to accept delivery of the parcel because Hill was not always at home or at one of his businesses to sign for the

delivery of a package. Lux denied knowing that the package contained drugs. She stated that Hill told her that the package would contain shoes and a sweater. Burroughs suggested to Lux that her story of non-involvement was not the same as the statement that Hill had given to the authorities. In fact, as Burroughs knew, Hill's statements were consistent with Lux's denial of involvement.

After Detective Burroughs misled Lux, she changed her story. She admitted that Hill had told her that the package that she was to receive would contain drugs. Lux had been dating Hill for the three or four weeks prior to her arrest and during that time she knew Hill was a drug dealer. She obtained this information both from Hill and from her cousin. Lux also provided information concerning other drug dealers with whom she was acquainted.

Lux told Burroughs and Stewart that two to three weeks prior to her arrest, she had received another package for Hill. Lux initially believed that the package did not contain contraband, but Hill later told her it contained drugs. Lux stated that Hill told her that he earned $20,000 to $25,000 profit from the sale of the cocaine from that package. Hill gave Lux various gifts and $400 to $500 cash, but Lux stated that she did not receive the cash and gifts in return for receiving and delivering the package.

On November 21, Burroughs, Stewart, Lux's attorney, and the Government's attorney interviewed Lux again. This time Lux denied any prior knowledge that the intercepted package contained drugs. She further denied knowing that Hill was a drug dealer.

Hill filed a timely pretrial motion for severance, which the trial court denied. At the joint trial of Hill and Lux, Lux's trial attorney, in his opening statement, stated that Lux would later testify. Over the objection of Hill, the trial court permitted Inspector Stewart and Detective Burroughs to testify as to Lux's confession in the Government's case in chief. Despite her counsel's statement in opening argument that she would testify, Lux never took the stand.

Hill testified at trial that he was expecting a package in the mail at about the time that the drug package arrived. The package that he was expecting was from Rodney Gardner in Los Angeles, California, was to be addressed to Lux, and was to contain caps, bags, and Turkish chains. Hill testified at trial that he asked Gardner to mail these items because Hill thought he could sell them at a profit. Hill stated that he received the package of clothing items about a week before trial. Inspector Stewart testified that Hill told her during interrogation that he had requested that the package be sent to Lux because he did not want his fiance, Lisa Pearson, to see the box. At trial, Hill testified that the package was sent to Lux because he was not always around to sign for parcels. Hill also testified that the list of transactions in his car were records of bets placed on an Atlantic City heavyweight boxing match, not drug transactions. The scales, Hill stated, he used to measure out a weight-gaining formula.

Hill testified that when he opened the drug package, he saw only soap and not drugs. He then threw the package in the trash. The Government, however, introduced evidence that Hill had searched the box of detergent for the cocaine. The signalling device had gone into alarm mode, and Inspector Stewart testified that this would not have occurred unless one of the bricks was taken at least halfway out of the box. However, Inspector Stewart also testified that it was "possible" that Hill could have triggered the alarm mode merely by pouring soap out of the box. The Government also introduced evidence, supported by videotapes, that the simulated bricks were placed inside the box in a horizontal position. When the police found the box in a trash can on Hill's front porch, however, one of the bricks was in a vertical position.

## II.

 Hill argues that the trial court erred in admitting Lux's confession to the police because Lux's admissions implicated Hill and he had no opportunity to cross-examine her at trial. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), governs Hill's argument. *Bruton* holds that the sixth amendment rights of a defendant are violated if the defendant's nontestifying codefendant makes a confession that implicates the defendant and the Government introduces the confession into evidence at their joint trial. The *Bruton* decision rests on a criminal defendant's right to confront and cross-examine his accuser under the confrontation clause of the sixth amendment. U.S. Const. amend. VI. If the accuser is a codefendant who makes a confession implicating the defendant and invokes his fifth amendment right to refuse to testify at trial, the accused defendant cannot exercise his constitutional right to cross-examination.

The *Bruton* Court rejected the suggestion that the trial court can cure the confrontation clause problem by instructing the jury that it must consider the confession of the codefendant only against that codefendant and not against the other defendant. The Court noted that in many cases the jury can be expected to follow instructions to disregard information but that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. at 1627. The Court found that, due to the "powerfully incriminating" nature of a codefendant's confession, the introduction of the confession in a joint trial was one of those situations where the jury could not be expected to follow a limiting instruction. *Id.* at 135–36, 88 S.Ct. at 1627–28.[1]

The Government argues that we should not apply *Bruton* to this case because Hill has failed to assert on appeal that the trial court erred when it denied Hill's motion for severance based upon a perceived *Bruton* problem. We disagree.

*Bruton* only requires that in a joint trial a defendant must be given an opportunity to cross-examine his codefendant when the government introduces a codefendant's confession that incriminates the defendant. If the defendant cannot cross-examine the defendant, those portions of the codefendant's confession that incriminate the defendant must be barred from trial. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). *Bruton*, however, does not hold that defendants in joint trials involving *Bruton* problems are entitled to separate trials. Of course, if the district court grants a motion to sever, *Bruton* problems will never arise. The only evidence that will be admitted in each trial will be the evidence that is admissible against each particular defendant. But *Bruton* does not require this step. Thus, Hill correctly limits his argument on appeal to the assertion that *Bruton* barred the admission of Lux's incriminating confession.

The Government also argues that *Bruton* should not be applied to this case because Lux's counsel stated at the opening of trial that Lux would testify. The Government argues that Lux's representation justified the Government's subsequent introduction of her confession because the Government expected that Lux would be available for cross-examination. It was not until the close of the Government's case that the Government learned that Lux would not take the stand. By this time, Lux's confession had been admitted into evidence. The Government argues that the application of *Bruton* to this case would constitute an "invitation to disaster," providing an incentive to future confessing codefendants to imitate Lux's behavior,

---

**1.** The *Bruton* line of analysis is applicable if the confession of a codefendant is admitted only against the codefendant. If, however, the government seeks to admit the codefendant's confession as substantive evidence against the defendant, the admissibility of the confession is governed by a different line of analysis as set forth in *Lee v. Illinois*, 476 U.S. 530, 542, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986).

thus allowing future defendants to obtain a reversal on the basis of *Bruton*. We disagree.

We first note that even though Lux's attorney initially stated that Lux would testify, a statement upon which the prosecutor and trial judge might have reasonably relied, we refuse to penalize Hill for his codefendant's subsequent decision not to testify. We cannot hold Hill responsible for Lux's actions. Indeed, *Bruton* and its progeny rest in part on the premise that collusive behavior cannot be assumed to exist between defendants and codefendants: "Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986) (quoting *Bruton*, 391 U.S. at 141, 88 S.Ct. at 1630 (White, J., dissenting)). Only the defendant, not his codefendants, can waive the defendant's constitutional rights.

We also note that logic does not support the Government's prediction that future codefendants will mimic Lux's behavior. Codefendants have little incentive to tell the jury that they will testify and then later decline to take the stand. The practice of creating unfulfilled expectations in the minds of the jurors does not help a codefendant's case. Moreover, a codefendant who has given a confession can rarely bar its admission as substantive evidence against himself or herself, as it is an admission of a party-opponent. Therefore, the confessing codefendant has the incentive to take the stand to testify that the damaging confession is not genuine. "[I]n the real world of criminal litigation, the defendant is seeking to *avoid* his confession—on the ground that it was not accurately reported, or that it was not really true when made." *Cruz v. New York*, 481 U.S. 186, 192, 107 S.Ct. 1714, 1718, 95 L.Ed.2d 162 (1987) (emphasis in original).

Of course, there will be future cases in which a codefendant like Lux unpredictably decides, for a variety of tactical reasons, not to take the stand after initially indicating otherwise.[2] This is the right of any codefendant. In *Richardson*, the Supreme Court suggested that the inconveniences that these unpredictable defendants produce is the price that we must pay for the continued adherence to *Bruton*. See *Richardson*, 481 U.S. at 209, 107 S.Ct. at 1708 (stating that it is not always possible to assure compliance with *Bruton ex ante*). The Court has noted that the price we must pay is comparatively small: "[By not following the rule adopted in *Bruton*] [w]e secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty. That price is too high." *Bruton*, 391 U.S. at 135, 88 S.Ct. at 1627 (quoting *People v. Fisher*, 249 N.Y. 419, 164 N.E. 336, 341 (1928) (Lehman, J., dissenting)).

We thus find *Bruton* applicable to this case and hold that the admission of Lux's clearly inculpatory statements that Hill was a drug dealer violated Hill's sixth amendment right to confront his accuser. See *United States v. Espinosa*, 771 F.2d 1382, 1399 (10th Cir.) (limiting *Bruton* applications to "clearly inculpatory" comments that are "vitally important to the government's case"), *cert. denied*, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

### III.

■ Once we determine that a *Bruton* error has occurred, we must reverse unless we find that the confrontation clause violation was harmless. *Cruz*, 481 U.S. at 194, 107 S.Ct. at 1719. Apart from Lux's confession, the Government's evidence against Hill is substantial. The police observed Lux receive a package of cocaine and then deliver it to Hill. Although Hill argues on appeal that he opened the package and threw it away upon learning that it did not contain the clothing that he was expecting,

---

**2.** Here, the Government suggested at oral argument why Lux may have declined to take the stand: Lux probably did not want to be impeached by the Government on the basis of her prior association with other drug dealers.

Inspector Stewart testified that someone had to have searched under the soap to trigger the signalling device. The police also testified that they found scales and transaction records of the type typically used in drug transactions.

We cannot conclude, however, that the admission of Lux's admission was "harmless beyond a reasonable doubt." *Harrington v. California*, 395 U.S. 250, 251, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284 (1969). The evidence against Hill was not overwhelming. Much of the Government's admissible evidence against Hill was circumstantial, and Hill proffered many explanations for the existence of the evidence. In light of the nature of the government's evidence, we conclude that it is unlikely that Lux's heavily incriminating statements concerning Hill's alleged involvement in drug trafficking, particularly Lux's allegation that Hill told her that the package would contain drugs, had no probable impact on the minds of the jury, *see id.* at 254, 89 S.Ct. at 1728.

We do not reach Hill's argument that the trial court erred in failing to grant a mistrial after the government introduced testimony implicating him in an uncharged crime. We REVERSE and REMAND for a new trial.