**Clarence SCOTT, Petitioner,**

v.

**Barbara BOCK, Respondent.**

**No. 99–10274–BC.**

United States District Court, E.D. Michigan, Northern Division.

Jan. 17, 2003.

Clarence Scott, Eastlake, MI, Pro se.

Thomas M. Chambers, Wayne County Prosecutor's Office, Detroit, MI, Debra M. Gagliardi, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Respondent.

### OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

LAWSON, District Judge.

The petitioner, Clarence Scott, a state prisoner presently incarcerated at the Oaks Correctional Facility in Eastlake, Michigan, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for first-degree murder and sentence of life imprisonment. The petitioner alleges, among other things, that his constitutional right to confrontation under the Sixth Amendment was violated when the prosecution introduced the incriminating statement of a co-defendant who later elected not to testify. The Court agrees that the petitioner's constitutional rights were violated, and finds that the Michigan courts' rejection of this claim was contrary to clearly

established federal law as determined by the Supreme Court of the United States. The introduction of the statement was improper and likely had a substantial and injurious effect upon the jury's verdict. Accordingly, the Court will conditionally grant a writ of habeas corpus, and direct the respondent to release the petitioner from custody unless the state retries him within ninety days.

## I.

In 1995, a jury in the Recorder's Court for the City of Detroit, Michigan found the petitioner guilty of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), (2) first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b), and (3) possession of a firearm during the commission of a felony ("felony firearm"), Mich. Comp. Laws § 750.227b. The petitioner was put to trial along with a co-defendant, Isaac Collier, who was also convicted of felony murder. According to the Michigan Court of Appeals, the convictions arose from

> the shooting death of Elwin Lilley on April 2, 1994 near Metro Airport in Romulus[, Michigan]. Defendants attempted to steal money from the victim while he was in his parked car in the parking lot of a McDonald's restaurant. Scott, who had a sawed-off shotgun in the waistband of his pants, put the gun to the victim's head and demanded money. After the victim started his car and attempted to drive away, Scott shot him in the head. Both defendants then took some items from the car. Collier then ran to a gas station and stole a getaway car.

*People v. Collier*, Nos. 184478 & 184480, 1997 WL 33347912, at *1 (Mich.Ct.App. May 30, 1997). The trial court sentenced the petitioner to two years in prison for the felony firearm conviction and a consec-

utive term of life imprisonment for the murder convictions. The petitioner has completed his sentence on the felony firearm conviction, and that conviction is not the subject of the present petition. *See Clemons v. Mendez*, 121 F.Supp.2d 1101, 1102–03 (E.D.Mich.2000) ("After a petitioner's sentence for a conviction has completely expired, the collateral consequences of that conviction are insufficient to render him 'in custody' under § 2254(a).") (citing *Maleng v. Cook*, 490 U.S. 488, 492, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (per curiam)).

The Michigan Court of Appeals vacated the petitioner's felony murder conviction on double jeopardy grounds, but affirmed his convictions for first-degree premeditated murder and felony firearm. *See People v. Collier*, 1997 WL 33347912, at *2 (Mich. App. 1997). The Michigan Supreme Court denied leave to appeal because it was "not persuaded that the questions presented should be reviewed." *People v. Scott*, 458 Mich. 853, 587 N.W.2d 635 (1998).

On August 2, 1999, the petitioner filed this habeas corpus petition pursuant to 28 U.S.C. § 2254. The petition alleges four grounds for relief:

I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED DEFENDANT–APPELLANT'S MOTIONS FOR SEVERANCE AND/OR SEPARATE JURIES.

II. THE COURT ERRED WHEN IT DENIED DEFENDANT–APPELLANT'S PRE–TRIAL MOTION TO SUPPRESS THE FRUITS OF AN ILLEGAL SEARCH.

III. DEFENDANT–APPELLANT'S RIGHT TO CONFRONTATION WAS VIOLATED BY ALLOWING THE CO–DEFENDANT'S STATEMENT TO BE READ TO THE JURY WHEN THE CO–

DEFENDANT SUBSEQUENT-
LY CHOSE NOT TO TESTIFY.

IV. THE TRIAL JUDGE ERRED
WHEN SHE DENIED DEFEN-
DANT'S PRE–TRIAL MOTION
TO QUASH THE FELONY–
MURDER COUNT.

The respondent argues in an answer to the petition filed through counsel that:

1. PETITIONER SHOULD NOT BE
ENTITLED TO FEDERAL HA-
BEAS CORPUS RELIEF ON THE
BASIS THAT THE TRIAL
COURT DENIED HIS MOTION
FOR SEVERANCE.

2. WHERE PETITIONER HAD A
FULL AND FAIR OPPORTUNI-
TY TO LITIGATE HIS FOURTH
AMENDMENT CLAIM IN THE
STATE COURTS FEDERAL HA-
BEAS RELIEF IS UNAVAIL-
ABLE TO HIM.

3. THE FACT THAT THE CONFES-
SION OF PETITIONER'S NON-
TESTIFYING CO–DEFENDANT
WAS ADMITTED AT TRIAL
SHOULD NOT ENTITLE PETI-
TIONER TO FEDERAL HABEAS
RELIEF.

4. PETITIONER'S CLAIM RE-
GARDING THE PRELIMINARY
EXAMINATION SHOULD NOT
ENTITLE HIM TO FEDERAL
HABEAS CORPUS RELIEF.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, altered the standard of review federal courts must apply when reviewing applications for a writ of habeas corpus. The AEDPA applies to all habeas petitions filed after the effective date of the Act, April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059,

138 L.Ed.2d 481 (1997). Because the petitioner's application was filed after April 24, 1996, the provisions of the AEDPA, including the amended standard of review, apply to this case.

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Federal courts thus are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995) ("We give complete defer-

ence to state court findings unless they are clearly erroneous.").

The United States Supreme Court has explained the proper construction of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.... A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor,* 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The Supreme Court held that a federal court should invoke the "unreasonable application" clause of § 2254(d)(1) and issue the writ "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable....

> [A]n unreasonable application of federal law is different from an incorrect application of federal law.... Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410, 411, 120 S.Ct. 1495. *See also Lewis v. Wilkinson,* 307 F.3d 413, 418 (6th Cir.2002).

With these standards in mind, the Court proceeds to the merits of the petition.

### III.

### A.

### 1.

■ The petitioner was tried jointly with his co-defendant, Isaac Collier, Jr. During the State's case-in-chief, and before Collier had made a final decision on whether he would testify in his own defense, the prosecutor called police sergeant Michael Ondejko as a witness. Ondejko had taken a statement from Collier in which Collier implicated himself and the petitioner in the shooting. The petitioner's attorney had previously moved for separate trials, and when that motion was denied, for separate juries, which motion was likewise denied. Before Ondejko testified, the petitioner's attorney objected to the introduction of Collier's confession, suggesting that the petitioner's confrontation rights would be abridged if Collier changed his mind and decided not to testify. The trial judge overruled that objection, stating, "We'll take that up if Mr. Collier doesn't testify." Trial Tr. III at 61–65.

Several witnesses testified that the petitioner was known as "Six–Nine." *See* Trial Tr. II at 108–09 (Dominic Triola's testimony); *id.* at 132–33 (Lisa Campbell's testimony); Trial Tr. III at 67 (Sue Rucker's testimony); *id.* at 81 (Michelle Swartz's testimony as read from the preliminary examination transcript). Thereafter, Sergeant Ondejko read Collier's confession to the jury, including the following:

> Saturday morning I woke up....

I counted my money. I had $365.00. I was short about $275.00. I discussed it with some other people, Dominic, and asked if he could help me out with some money. He said he would if he had it, but he didn't have it.

I went back to the room and discussed it with Six–Nine. He said if you get a ride, ... we'll go get some money some way. So Dominic let me use the car because he knew I would repay him.

We drove out towards the airport and we circled around the Comfort Inn. We were planning to take some money from someone. There was no one around, so I drove over to McDonald's parking lot, circled around one time, and there was a car parked at the back of the building.

Six–Nine said, 'Back up to that car.' The man was backed in also. He was reading the newspaper. Six–Nine got out of the car and stuck the gun on the man and told him to give him his money.

The man resisted and he started tapping the gun out at his face. Then he started the car and tried to drive off. Six–Nine shot him. The car sped up into a pole and came backwards.

At this time I tried to take off and the car hit our car and our car shut off. The car we were in has to be pushed [to] start, so immediately I ... got out and ran, and Six–Nine was already out and he ran also. He ran towards the highway. I ran to the gas station looking for a running car.

There was a woman getting out from her car, and as she opened the door, I approached her and asked for her keys. She gave them to me and she asked for her purse. I let her get it, and then I took off towards the highway.

There was a red light. I hesitated, then I ran the red light heading towards the highway. I saw Six–Nine on a ramp or hill and stopped the car and waited

for him. He got in and I said, 'Throw that damn gun away,' and he wouldn't do it.

We headed east on I–94....

We headed over [to] Six–Nine's girl-friend's house. He got out to tell her to lie for him. I'm not sure what he told her.

From there we went to my uncle's house.... My Uncle Dillard came over while we were there, and he was aware we had a stolen car, not knowing what else happened.

He took me and Shelly and Six–Nine over [to] his house. I put the car in the garage....

Trial Tr. III at 139–43.

The following questions were asked and answered after Collier wrote his confession:

Q. [Sergeant Ondejko] What was the date?

A. [Isaac Collier] April 2nd.

. . . . .

Q. How were you and Six–Nine going to "get some money?"

A. Rob or take some money from someone.

. . . . .

Q. What was Six–Nine wearing on that day?

A. Black long trench coat, black pants and T-shirt.

. . . . .

Q. Describe the gun.

A. Sawed-off shotgun, one shot, 410 gauge.

Q. Did you have a gun?

A. No.

Q. Have you ever been threatened to give your statement?

A. No.

Q. Have you been made any promises?

A. No.

*Id.* at 144–45.

The trial court did not limit the purpose for which this evidence was offered. For instance, the jury was not informed that the statement was admissible only as to Collier, or that it could not be considered as substantive evidence of the petitioner's guilt. Rather, the trial court told the jury:

Now, I want to talk to you about the statement made by Isaac Collier to the police, as the People have introduced that statement here, and you can't consider that statement—what we call an out of court statement—unless you do the following:

First, you decide the defendant, Isaac Collier, actually made the statement as it was given to you. If you find that he did not make the statement at all, you shouldn't consider it.

If you find he made part of the statement, you may consider that part as evidence.

If you find that Isaac Collier did make the statement, you must decide whether the whole statement or part of it is true. When you think about whether the statement is true, you should consider how and when the statement was made, as well as all the other evidence in the case.

You may give the statement whatever importance you think it deserves. You may decide that it was very important or not very important at all. In deciding this, you should once again think about how and when the statement was made, and about all the other evidence in the case.

Trial Tr. IV at 80–81.

After the prosecutor rested, neither defendant testified nor presented any witnesses.

The petitioner now contends, as he did in state court, that he was deprived of his right of confrontation when Collier's confession was read to the jury without an opportunity to cross-examine him. The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause is applicable to the States through the Fourteenth Amendment. *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The purpose of the Confrontation Clause was to "constitutionalize" certain common-law testimonial guarantees by which an accused could test a witness' perception, memory, ability to relate or communicate, and, perhaps most importantly, sincerity. *See United States v. Chapin,* 231 F.Supp.2d 600, 606 (E.D.Mich.2002).

The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States,* 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Those testimonial guarantees thus included the oath, a witness' personal appearance before the fact finder, and cross-examination. As the Supreme Court summarized succinctly in *California v. Green,*

399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970):

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth" [5 J. Wigmore, *Evidence* § 1367, at 32 (J. Chadbourn rev.1974) ]; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*Id.* at 158, 90 S.Ct. 1930 (footnote omitted).

In *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the admission of a nontestifying co-defendant's confession at a joint trial violated the petitioner's right of confrontation despite the jury being instructed that the co-defendant's confession could not be used to determine the petitioner's guilt or innocence. The Court held that the prejudice that may result from a co-defendant's confession "cannot be dispelled by cross-examination if the co-defendant does not take the stand. Limiting instructions to the jury may not in fact erase the prejudice." *Id.* at 132, 88 S.Ct. 1620 (internal quotation marks and citations omitted).

The Supreme Court has consistently held that "a non-testifying co-defendant's statements that implicate a defendant are presumptively unreliable and their admission violates the Confrontation Clause." *Calvert v. Wilson*, 288 F.3d 823, 828 (6th Cir.2002) (citing *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)). For instance, in *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Supreme Court explained:

> As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.

*Id.* at 545, 106 S.Ct. 2056. The Court held that admitting a non-testifying accomplice's confession to convict the defendant in that case violated the Confrontation Clause. In *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), the Supreme Court held that such statements do not fall within a firmly rooted exception to the hearsay rule, and thus cannot satisfy the Confrontation Clause unless they are supported by particularized guarantees of trustworthiness. *Id.* at 134, 119 S.Ct. 1887. Those indicia of reliability must be inherent in the statement itself and the circumstances under which it is made, without reference to corroborating or other evidence at trial. *See Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). However, the Court offered a "cogent reminder" concerning evidence of this nature:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Lilly*, 527 U.S. at 137, 119 S.Ct. 1887.

The Michigan Court of Appeals did not analyze the claim of error in admitting Collier's confession under the *Lee v. Illi-*

*nois* line of cases. It concluded on review of the petitioner's claim that there was no *Bruton* error in this case, not because Collier's statement was particularly reliable, but because the trial judge was apparently misled by Collier's intention to testify at trial. *See Collier,* 1997 WL 33347912, at *6–7. Collier's later decision not to testify, the court found, did not render the trial court's original determination erroneous or mean that the petitioner's rights had been violated.

The state court of appeals' holding is contrary to clearly established federal law as determined by the Supreme Court in *Lee* and *Lilly,* and is an unreasonable application of *Bruton* and its progeny. *See* 28 U.S.C. § 2254(d)(1). Collier's statement, although implicating himself in the criminal transaction, blamed the petitioner for the actual shooting, and it contained no particularized guarantees of trustworthiness. It was constitutionally inadmissible as substantive evidence of the petitioner's guilt, as were the accomplices' statements in *Lee, Lilly,* and *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). The petitioner's rights were violated because he could not subject Collier's statement to adversarial testing. Under *Bruton,* in which an instruction limiting the use of the accomplice's statement was given, an accused's Confrontation Clause rights were not dependent on the shifting testimonial intentions of a co-defendant at trial. Rather, the constitutional right of confrontation belongs to the petitioner, not the trial judge or the petitioner's co-defendant. As the Tenth Circuit has explained, the Supreme Court's *Bruton* jurisprudence makes it clear that a prosecutor who introduces a pretrial statement of a co-defendant which incriminates a defendant risks a mistrial—or a reversal—if the co-defendant decides not to testify:

> Of course, there will be future cases in which a codefendant like Lux unpredict-

ably decides, for a variety of tactical reasons, not to take the stand after initially indicating otherwise. This is the right of any codefendant. In *Richardson,* the Supreme Court suggested that the inconveniences that these unpredictable defendants produce is the price that we must pay for the continued adherence to *Bruton. See Richardson,* 481 U.S. at 209, 107 S.Ct. 1702 (stating that it is not always possible to assure compliance with *Bruton ex ante* ). The Court has noted that the price we must pay is comparatively small: "[By not following the rule adopted in *Bruton* ] [w]e secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty. That price is too high." *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620 (quoting *People v. Fisher,* 249 N.Y. 419, 164 N.E. 336, 341 (1928) (Lehman, J., dissenting)).

*United States v. Hill,* 901 F.2d 880, 884 (10th Cir.1990) (footnote and parallel citations omitted).

In this case, the petitioner was unable to cross-examine Collier about his confession because Collier exercised his constitutional right not to testify. The confession implicated the petitioner and identified him, at least by his nickname. The use of nicknames rather than the petitioner's proper name does not lessen the *Bruton* violation. *See Gray,* 523 U.S. at 195–96, 118 S.Ct. 1151. Collier's confession was not redacted to eliminate any reference to the petitioner. *Cf. Richardson,* 481 U.S. at 211, 107 S.Ct. 1702 (holding "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence").

The petitioner offered the trial judge practical alternatives to the risky practice of relying on the co-defendant's ambiguous intention to testify: severance or separate juries. The petitioner also interposed a timely objection to the introduction of Collier's statement. The trial judge's "cross-that-bridge-when-we-come-to-it" approach was ineffective to protect the petitioner's Sixth Amendment rights, however, when the Rubicon was crossed and the bridge was burned by Collier's failure to testify.

The state court of appeals mentioned that defense counsel "did not renew his objection to the fact that the statement had been admitted," although its decision did not turn on that point. It is not clear under Michigan law that renewing the objection was procedurally necessary, *see* Mich. R. Evid. 103 (rev.2002) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."), and there is certainly no clear indication that the appellate court's judgment rested on a state procedural bar. *See Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (holding that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar") (citation omitted).

The petitioner has made the showing required by 28 U.S.C. § 2254(d)(1) because the decision of the Michigan Court of Appeals—that no *Bruton* error occurred because the petitioner's rights under the Confrontation Clause were subordinate to the whims of his co-defendant—was an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

Moreover, since no limiting instruction was given at trial, the jury was allowed to consider the co-defendant's confession as substantive evidence of the petitioner's guilt, an aspect of the Confrontation Clause not addressed by the state appellate court, but nonetheless contrary to *Lee* and its progeny. By allowing evidence in circumstances clearly at odds with Supreme Court precedent, the decision of the court of appeals was "contrary to" federal law as established by the Supreme Court. *See Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495.

2.

The Michigan Court of Appeals concluded that, even if there was a technical violation of *Bruton*, it "would find the error to be harmless beyond a reasonable doubt." *Collier*, No. 184480, 1997 WL 33347912, at *6. The court reached that conclusion because, in its opinion, "the properly admitted evidence of guilt was overwhelming and the prejudicial effect of the codefendant's statement was so insignificant by comparison." *Id.* at *7.

■ Although not citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the state court articulated the rule set forth by the Supreme Court which the states must apply on direct review when evaluating the effect of non-structural constitutional error in criminal proceedings. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 608. Indeed, the erroneous admission of a co-defendant's confession at a joint trial is the sort of non-structural error that is subject to harmless error analysis. *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ This Court does not agree that the state appellate court properly applied the *Chapman* standard. But federal courts on habeas review must apply the "less strict ... measure of harmlessness" set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *O'Neal v. McAninch,* 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). The *Brecht* test "for determining whether habeas relief must be granted is whether the ... error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The Sixth Circuit has held that the *Brecht* test survived the amendments to 28 U.S.C. § 2254 enacted by the AEDPA. *See Nevers v. Killinger,* 169 F.3d 352, 371 (6th Cir.1999). A federal court need not specifically analyze whether the state's application of the *Chapman* test constitutes an unreasonable application of federal law under 28 U.S.C. § 2254(d)(2), however, since a "petitioner [who] is able to make [the *Brecht* ] showing ... will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt was outside the realm of plausible credible outcomes, and therefore resulted from an unreasonable application of *Chapman.*" *Barker v. Yukins,* 199 F.3d 867, 872 (6th Cir.1999) (citing *Nevers,* 169 F.3d at 371–72). In other words, the "unreasonable application" test promulgated by the AEDPA is subsumed by the *Brecht* analysis.

The *Brecht* test requires the court to assess the impact of the constitutional error on the jury's decision. It requires an analysis which is different than simply measuring the sufficiency of the evidence after subtracting the offending item. As the Sixth Circuit explained: "The *Brecht* test does not say 'only errors that turn acquittals into convictions are harmful.'

As Justice Stevens put it in *Brecht,* 'the question is not "were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." ' " *Kyger v. Carlton,* 146 F.3d 374, 382 (6th Cir.1998) (quoting *Brecht,* 507 U.S. at 642–43, 113 S.Ct. 1710 (Stevens, J., concurring)). "[I]t is improper in a *Brecht* inquiry to focus on the sufficiency of the untainted evidence." *Ibid.*

■ The Michigan Court of Appeals summarized the evidence in this case as follows:

Before [Collier's] statement was admitted, there was ample testimony that Scott had killed the victim. Yolanda Pezz[a]t heard a loud pop and identified defendant as the man standing next to the gray car with a gun in his hand. Three other witnesses, while not positively identifying defendant as the man with the shotgun, all described a man wearing a black trench coat as the shooter. Dean Patton also identified Scott as the man wearing the black trench coat and that Scott had a gun.

Evidence seized from the motel room where the defendants had been staying also confirmed their actions in the killing. The police seized live .410–gauge shotgun shells, and pellets taken from the body of the victim were of the same size and weight as the pellets taken from the live shells found. There was additional testimony from Sue Rucker that she saw Scott with the sawed-off shotgun. Moreover, Scott had told Lisa Campbell that he had been involved in a murder, and he told his girlfriend, Venita Campbell, that he had gotten into some trouble at the airport. Specifically, Venita told the police that Scott had

told her that he had to kill a man that he was trying to rob. Venita later retracted this testimony at trial, but she had made this statement to the police.

With respect to the statement itself, this is not a situation where Collier denied all criminal responsibility and shifted all blame onto Scott. In the statement, Collier admitted that he and Scott were out to "take some money from someone." Collier also stated th[at] "Six–Nine" (referring to Scott) "stuck the gun on the man and told him to give him his money." The man attempted to drive off, and Scott shot him. Although Collier squarely places the actual shooting on Scott, there was ample evidence presented by the prosecutor before the statement was admitted that Scott was the shooter. Had the statement never been admitted, there was still overwhelming evidence that Scott was the shooter in this case.

*Collier*, 1997 WL 33347912, at *6.

Additionally, Michelle Swartz's testimony from the preliminary examination was read into the record because she could not be located. Swartz testified at the preliminary examination that, on the day of the murder, Collier had said "Six–Nine" (the petitioner) shot somebody. *See* Trial Tr. III at 92.

The record supports the state court's summation of the evidence in many aspects. Yolanda Pezzat did identify the petitioner as the man who pointed a long gun at the driver's side of the victim's car. *See* Trial Tr. II at 17–26. And Dean Patton did identify the petitioner as the man who put a gun in his waistband, went to the victim's car, pulled out the gun, put his arm in the car, and moved his arm back and forth. *See id.* at 67–73.

However, the state court's finding that "[t]hree other witnesses, while not positively identifying [the petitioner] as the

man with the shotgun, all described a man wearing a black trench coat as the shooter" is an unreasonable determination of the facts. None of the eyewitnesses for the State saw the actual shooting. Yolanda Pezzat and Dean Patton specifically testified that they did not see the shooting. *See id.* at 32 and 98. And although Benjamin Pezzat saw someone in a black trench coat pointing a gun at a man in the victim's car, he was unable to identify the petitioner and he did not testify about a shooting. *See id.* at 36–42.

Roger Nohouig testified that one of two men who tried to push the victim's car and then fled on foot wore a black trench coat, but Nohouig was unable to identify the petitioner and he did not see anyone with a gun. *See id.* at 43–50. Nancy Vojakovic identified the petitioner at trial as one of two men who ran past her van after the victim's car hit the McDonald's restaurant. She did not see an object in either man's hands. *See id.* at 52–61. Roberto Gonzalez saw a man in a black trench coat, but he saw him at the gas station next to the McDonald's restaurant from where Collier stole the getaway car, and he did not identify the petitioner as the man. *See id.* at 63–66.

Furthermore, Lisa Campbell testified on cross-examination that the petitioner had a history of bragging about his involvement in violent events and the bragging was never true. *See id.* at 132–38. Venita Campbell testified that the police had threatened to take her children if she did not say the petitioner was involved in the murder, *see id.* at 143–44 and 156–71, although a police officer denied that allegation. *See* Trial Tr. III at 39–40.

The quantum of evidence is a pertinent factor in pursuing the appropriate inquiry under *Brecht*, but the Court must also examine the nature of the evidence. Ab-

sent Collier's confession, the nature of the State's case against the petitioner was largely circumstantial. However, if the jurors chose to believe Collier's confession, there was no need to draw any inferences in order to conclude that the petitioner was the shooter, or that he planned the robbery. *See Calvert,* 288 F.3d at 835 ("With the admission of [the co-defendant's] statement, the jury had no need to engage in any inferences at all.") The confession was not cumulative evidence; rather, it tied the evidence together and clinched the case for the prosecution. It provided the only direct evidence that: (1) Collier and the petitioner planned a robbery; (2) the petitioner ordered Collier to back up to Lilley's car; (3) the petitioner demanded money from Lilley while pointing a gun at him; (4) when Lilley resisted, the petitioner or Lilley tapped the gun; and (5) the petitioner shot the victim as he tried to drive away.

The confession likely had a substantial effect in persuading the jury to find the petitioner guilty of first-degree premeditated murder in addition to felony murder. A person commits first-degree murder under Michigan law when intentionally killing another "by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," Mich. Comp. Laws § 750.316(1)(a), or by perpetrating a murder in the course of certain felonies, such as robbery. Mich. Comp. Laws § 750.316(1)(b). The defendant was convicted under both of these provisions, but the felony murder conviction was vacated by the court of appeals, leaving only the conviction for first-degree premeditated murder for this Court to review in this habeas proceeding. In order for one to be convicted of murder involving premeditation and deliberation, the defendant "must have sufficient time to take a second look" at his decision to kill. *People v. Edwards,* 139 Mich.App. 711, 719, 362 N.W.2d 775,

779 (1984). "One cannot instantaneously premeditate a murder" in Michigan, and while premeditation and deliberation can be inferred from the circumstances of the homicide, they cannot be the product of speculation. *People v. Plummer,* 229 Mich.App. 293, 301, 305, 581 N.W.2d 753, 757, 759 (1998). Although first-degree *felony* murder could arguably be inferred from the circumstances surrounding the homicide, without Collier's untested confession the jury in this case would have had little basis for concluding that the homicide was the result of premeditation and deliberation. Rather, the facts are consistent with a case of a robbery gone wrong.

With these considerations in mind, the Court concludes that the *Bruton* error was not harmless. It likely had a substantial and injurious effect on the jury's verdict and resulted in actual prejudice under the test adopted in *Brecht.* Therefore, the state court's finding of harmless error was an unreasonable application of *Chapman,* and the petitioner is entitled to habeas corpus relief on the basis of his *Bruton* claim.

### B.

■ The remaining claims are easily dispatched. The petitioner's claim that the trial court improperly declined to sever his trial from that of Collier is rendered moot by the Court's grant of habeas relief for the *Bruton* violation that occurred when the two defendants were tried together and Collier's confession was received in evidence.

■ The search and seizure claim is barred by the Supreme Court's decision in *Stone v. Powell,* 428 U.S. 465, 481–82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), because the State provided the petitioner a full and fair opportunity to litigate his

Fourth Amendment claim in the Michigan state courts. Specifically, the petitioner raised his Fourth Amendment claim in the trial court, which held an evidentiary hearing; the Michigan Court of Appeals addressed his claim on the merits; and the Michigan Supreme Court which denied leave to appeal.

■ Finally, the petitioner's claim that the trial court erroneously failed to quash the felony murder count does not warrant habeas relief. The petitioner contends that, with the exception of Isaac Collier's confession, there was no evidence presented at the preliminary examination to support the felony murder charge, and he should not have been bound over to circuit court on the charge of felony murder. However, the Michigan Court of Appeals vacated the petitioner's felony murder conviction, essentially rendering the issue moot. Furthermore, the petitioner had no right to a preliminary examination. *Gerstein v. Pugh,* 420 U.S. 103, 123, and 125 n. 26, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Dillard v. Bomar,* 342 F.2d 789, 790 (6th Cir.1965). To the extent that the petitioner believes that the trial court violated Michigan state law in denying him a preliminary hearing, that claim is not cognizable on federal habeas review. *See Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

IV.

The trial court violated the petitioner's constitutional rights by allowing in evidence the pretrial statement of a nontestifying co-defendant that incriminated the petitioner. The decision of the Michigan Court of Appeals concluding otherwise was contrary to federal law established by the Supreme Court of the United States, and the constitutional error had a substantial and injurious effect on the jury's verdict.

Accordingly, it is **ORDERED** that a writ of habeas corpus is **CONDITIONALLY GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial within ninety days.

### *JUDGMENT*

In accordance with the Opinion and Order entered on this date,

It is **ORDERED AND ADJUDGED** that the Petition For Writ of Habeas Corpus is **CONDITIONALLY GRANTED**.

It is further **ORDERED AND ADJUDGED** that the petitioner's conviction for first-degree murder, contrary to Mich. Comp. Laws § 750.316(1)(a), is **VACATED**.

It is further **ORDERED AND ADJUDGED** that the respondent shall release the petitioner from custody unless the State brings him to trial within ninety days.